**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Robert L. Brown, | : |
| | : |
| Plaintiff | :   Civil Action No. |
| | : |
| vs. | : |
| | : |
| RC-1, Inc. d/b/a Hi Solutions; Hi Solutions | : |
| LLC; The Home Integrator Holdings, LLC; | : |
| Booyah Technologies, LLC; Media Design | : |
| Associates, Inc.; Medley Communications, | : |
| Inc.; Hi Solutions of So Cal, LLC; ITEC | : |
| Consultants, LLC; Bouc Construction | : |
| Services, Inc. d/b/a Best Connected Systems; | : |
| Media Tech LLC; John E. Parker; Darrin | : |
| Medley; and John Ford, | : |
| | : |
| Defendants | : |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Introduction

Robert L. Brown ("Plaintiff"), by and through undersigned counsel, brings this employment action against RC-1, Inc. d/b/a Hi Solutions ("RC-1"), Hi Solutions LLC ("Hi Solutions"), The Home Integrator Holdings, LLC ("Home Integrator"), Booyah Technologies, LLC ("Booyah"), Media Design Associates, Inc. ("MDA"), Medley Communications, Inc. ("Medley Comm"), Hi Solutions of So Cal, LLC ("Hi Solutions So Cal"), ITEC Consultants, LLC ("ITEC"), Bouc Construction Services, Inc. d/b/a Best Connected Systems ("Best Connected"), and Media Tech LLC ("Media Tech"), John E. Parker ("Parker"), Darrin Medley ("Medley"), and John Ford ("Ford") (collectively "Defendants").

Defendants willfully failed to pay—and continue to fail to pay—salary, bonus, accrued vacation pay, and amounts due under a convertible note owed to Plaintiff in violation of the New Jersey Wage Payment Law, N.J.S.A. 34:11-4.1 *et seq.*, as amended by the New Jersey Wage Theft

Act ("WPL"); and common law. Plaintiff resigned for "Good Reason" under his Employment Agreement after Defendants failed to remedy these breaches. Plaintiff seeks all damages, including unpaid wages, compensatory damages, and liquidated damages, and all other relief under applicable state law as this Court deems appropriate.

## Jurisdiction and Venue

1.      The causes of action which form the basis of this matter arise under the WPL and common law.

2.      The District Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and Defendants.

3.      Venue is proper in the District Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within this District and Defendants conduct business within this District.

## The Parties

4.      Plaintiff is an adult individual and is a citizen and resident of the United States. Plaintiff resides in Medford, New Jersey.

5.      At all relevant times, Plaintiff was an "employee" of Defendants within the meaning of the statutes that form the basis of this action.

6.      RC-1 is a Nevada shell corporation with its headquarters located at 301 S. State Street, Suite S103, Newtown, PA 18940, and it does business as "Hi Solutions."

7.      RC-1 is engaged in an industry affecting interstate commerce and regularly conducts business in the State of New Jersey.

8.      At all relevant times, RC-1 acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with RC-1 and in furtherance of RC-1's business, including but not limited to Parker, Ford and Medley.

9.      At all relevant times, RC-1 acted as an "employer" within the meaning of the statutes that form the basis of this action.

10.     Hi Solutions is a Delaware corporation with its headquarters located at 301 S. State Street, Suite S103, Newtown, PA 18940.

11.     Hi Solutions is a fully owned subsidiary of RC-1.

12.     Hi Solutions is engaged in an industry affecting interstate commerce and regularly conducts business in the State of New Jersey.

13.     At all relevant times, Hi Solutions acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with Hi Solutions and in furtherance of Hi Solutions' business, including but not limited to Parker, Hi Solutions' Chief Executive Officer, President, and Secretary, Ford, Hi Solutions' Chief Strategy Officer, and Medley, Hi Solutions' Chief Operating Officer.

14.     At all relevant times, Hi Solutions was a joint or co-employer of Plaintiff because it shared control over the terms and conditions of Plaintiff's employment with RC-1 and the other subsidiaries:

        (a)      Plaintiff performed accounting and finance duties for Hi Solutions.

        (b)      Hi Solutions contributed to RC-1's operating expenses, including compensation and benefits for Plaintiff and three other individuals on the corporate team who reported up through the finance group and Medley.

(c)    Hi Solutions shared the same human resources policies as RC-1 and the other subsidiaries, including a sales commission policy and plan, and employment-related documents such as offer letters.

(d)    Hi Solutions shared the same liability and health insurance policies as RC-1 and the other subsidiaries.

(e)    Hi Solutions is the payroll entity for all employees of RC-1 and the other subsidiaries and files federal, state and local payroll taxes for all employees.

15.    Home Integrator is a Delaware corporation with its headquarters located at 301 S. State Street, Suite S103, Newtown, PA 18940.

16.    Home Integrator is a fully owned subsidiary of RC-1.

17.    Home Integrator is engaged in an industry affecting interstate commerce and regularly conducts business in the State of New Jersey.

18.    At all relevant times, Home Integrator acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with Home Integrator and in furtherance of Home Integrator's business, including but not limited to Parker, Home Integrator's Chief Executive Officer, President, and Secretary, Ford, Home Integrator's Chief Strategy Officer, and Medley, Home Integrator's Chief Operating Officer.

19.    At all relevant times, Home Integrator was a joint or co-employer of Plaintiff because it shared control over the terms and conditions of Plaintiff's employment with RC-1 and the other subsidiaries:

(a)    Plaintiff performed accounting and finance duties for Home Integrator.

(b)    Home Integrator contributed to RC-1's operating expenses, including compensation and benefits for Plaintiff and three other individuals on the corporate team who reported up through the finance group and Medley.

4

(c)     Home Integrator shared the same human resources policies as RC-1 and the other subsidiaries, including a sales commission policy and plan, and employment-related documents such as offer letters.

(d)     Home Integrator shared the same liability and health insurance policies as RC-1 and the other subsidiaries.

(e)     Home Integrator maintains the complete set of books, records, and accounting for RC-1 and the other subsidiaries.

20.     Booyah is a Pennsylvania corporation with its headquarters located at 86 Tomlinson Road, Suite D, Huntingdon Valley, PA 19006.

21.     Booyah is a fully owned subsidiary of RC-1.

22.     Booyah is engaged in an industry affecting interstate commerce and regularly conducts business in the State of New Jersey.

23.     At all relevant times, Booyah acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with Booyah and in furtherance of Booyah's business, including but not limited to Parker and Ben Marlow, Booyah's President and Chief Executive Officer.

24.     At all relevant times, Booyah was a joint or co-employer of Plaintiff because it shared control over the terms and conditions of Plaintiff's employment with RC-1 and the other subsidiaries:

(a)     Plaintiff performed accounting and finance duties for Booyah.

(b)     Booyah contributed to RC-1's operating expenses, including compensation and benefits for Plaintiff and two other individuals on the corporate team who reported up through the finance group and Medley.

(c)    Booyah shared the same human resources policies as RC-1 and the other subsidiaries including a sales commission policy and plan, and employment-related documents such as offer letters.

(d)    Booyah shared the same liability and health insurance policies as RC-1 and the other subsidiaries.

25.    MDA is a Florida corporation with its headquarters located at 3043 NW 60th St, Fort St, Fort Lauderdale, FL 33309.

26.    MDA is a subsidiary of RC-1.

27.    MDA is engaged in an industry affecting interstate commerce and regularly conducts business in the State of New Jersey.

28.    At all relevant times, MDA acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with MDA and in furtherance of MDA's business, including but not limited to Parker and Michael Wohl, RC-1's General Manager and MDA's President and Chief Executive Officer.

29.    At all relevant times, MDA was a joint or co-employer of Plaintiff because it shared control over the terms and conditions of Plaintiff's employment with RC-1 and the other subsidiaries:

(a)    Plaintiff performed accounting and finance duties for MDA.

(b)    MDA contributed to RC-1's operating expenses, including compensation and benefits for Plaintiff and two other individuals on the corporate team who reported up through the finance group and Medley.

(c)    MDA shared the same human resources policies as RC-1 and the other subsidiaries, including a sales commission policy and plan, and employment-related documents such as offer letters.

(d)     MDA shared the same liability and health insurance policies as RC-1 and the other subsidiaries.

30.     Medley Comm is a California corporation with its headquarters located at 27280 Via Industria, Suite B, Temecula, California 92590.

31.     Medley Comm is a subsidiary of RC-1.

32.     Medley Comm is engaged in an industry affecting interstate commerce and regularly conducts business in the State of New Jersey.

33.     At all relevant times, Medley Comm acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with Medley Comm and in furtherance of Medley Comm's business, including but not limited to Parker and Medley, RC-1's Chief Operating Officer and Medley Comm's President.

34.     At all relevant times, Medley Comm was a joint or co-employer of Plaintiff because it shared control over the terms and conditions of Plaintiff's employment with RC-1 and the other subsidiaries:

(a)     Plaintiff performed accounting and finance duties for Medley Comm.

(b)     Medley Comm contributed to RC-1's operating expenses, including compensation and benefits for Plaintiff and two other individuals on the corporate team who reported up through the finance group and Medley.

(c)     Medley Comm shared the same human resources policies as RC-1 and the other subsidiaries, including a sales commission policy and plan, and employment-related documents such as offer letters.

(d)     Medley Comm shared the same liability and health insurance policies as RC-1 and the other subsidiaries.

35.    Hi Solutions So Cal is a California corporation with its headquarters located at 27280 Via Industria, Suite B, Temecula, California 92590.

36.    Hi Solutions So Cal is a fully owned subsidiary of RC-1.

37.    Hi Solutions So Cal is engaged in an industry affecting interstate commerce and regularly conducts business in the State of New Jersey.

38.    At all relevant times, Hi Solutions So Cal acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with Hi Solutions So Cal and in furtherance of Hi Solutions So Cal's business, including but not limited to Parker and Medley, RC-1's Chief Operating Officer and Medley Comm's President.

39.    At all relevant times, Hi Solutions So Cal was a joint or co-employer of Plaintiff because it shared control over the terms and conditions of Plaintiff's employment with RC-1 and the other subsidiaries:

(a)    Plaintiff performed accounting and finance duties for Hi Solutions So Cal.

(b)    Hi Solutions So Cal contributed to RC-1's operating expenses, including compensation and benefits for Plaintiff and two other individuals on the corporate team who reported up through the finance group and Medley.

(c)    Hi Solutions So Cal shared the same human resources policies as RC-1 and the other subsidiaries.

(d)    Hi Solutions So Cal shared the same liability and health insurance policies as RC-1 and the other subsidiaries, including a sales commission policy and plan, and employment-related documents such as offer letters.

40.    ITEC is a New Jersey corporation with its headquarters located at 101 Park Avenue, Union Beach, NJ 07735.

41.    ITEC is a fully owned subsidiary of RC-1.

42.     ITEC is engaged in an industry affecting interstate commerce and regularly conducts business in the State of New Jersey.

43.     At all relevant times, ITEC acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with ITEC and in furtherance of ITEC's business, including but not limited to Parker and Rob Ross, RC-1's Regional Director and ITEC's Chief Executive Officer.

44.     At all relevant times, ITEC was a joint or co-employer of Plaintiff because it shared control over the terms and conditions of Plaintiff's employment with RC-1 and the other subsidiaries:

(a)     Plaintiff performed accounting and finance duties for ITEC.

(b)     ITEC contributed to RC-1's operating expenses, including compensation and benefits for Plaintiff and two other individuals on the corporate team who reported up through the finance group and Medley.

(c)     ITEC shared the same human resources policies as RC-1 and the other subsidiaries, including a sales commission policy and plan, and employment-related documents such as offer letters.

(d)     ITEC shared the same liability and health insurance policies as RC-1 and the other subsidiaries.

45.     Best Connected is a California corporation with its headquarters located at 1733 Monrovia #H, Costa Mesa CA 92627 and a business address of P.O. Box 275, Hakala, HI 96710.

46.     Best Connected is a subsidiary of RC-1.

47.     Best Connected is engaged in an industry affecting interstate commerce and regularly conducts business in the State of New Jersey.

48.    At all relevant times, Best Connected acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with Best Connected and in furtherance of Best Connected's business, including but not limited to Parker and Edward Bouc, RC-1's Regional Director and Best Connected's Chief Executive Officer.

49.    At all relevant times, Best Connected was a joint or co-employer of Plaintiff because it shared control over the terms and conditions of Plaintiff's employment with RC-1 and the other subsidiaries:

(a)    Plaintiff performed accounting and finance duties for Best Connected.

(b)    Best Connected contributed to RC-1's operating expenses, including compensation and benefits for Plaintiff and two other individuals on the corporate team who reported up through the finance group and Medley.

(c)    Best Connected shared the same human resources policies as RC-1 and the other subsidiaries, including a sales commission policy and plan, and employment-related documents such as offer letters.

(d)    Best Connected shared the same liability and health insurance policies as RC-1 and the other subsidiaries.

50.    Media Tech is an Illinois corporation with its headquarters located at 1830 Wallace Ave, Ste 220, Lake Charles, IL 60174.

51.    Media Tech is a fully owned subsidiary of RC-1.

52.    Media Tech is engaged in an industry affecting interstate commerce and regularly conducts business in the State of New Jersey.

53.    At all relevant times, Media Tech acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with Media

Tech and in furtherance of Media Tech's business, including but not limited to Parker, Daker, Faber, and Young.

54.     At all relevant times, Media Tech was a joint or co-employer of Plaintiff because it shared control over the terms and conditions of Plaintiff's employment with RC-1 and the other subsidiaries:

> (a)     Plaintiff performed accounting and finance duties for Media Tech.

> (b)     Media Tech contributed to RC-1's operating expenses, including compensation and benefits for Plaintiff and two other individuals on the corporate team who reported up through the finance group and Medley.

> (c)     Media Tech shared the same human resources policies as RC-1 and the other subsidiaries, including a sales commission policy and plan, and employment-related documents such as offer letters.

> (d)     Media Tech shared the same liability and health insurance policies as RC-1 and the other subsidiaries.

55.     Parker is an adult individual and is a citizen and resident of the United States. Parker resides in Pennsylvania.

56.     At all relevant times, Parker was RC-1's Chief Executive Officer, President, and Secretary.

57.     Parker controls RC-1's and its subsidiaries' operations and finances and makes all significant business decisions for RC-1 and its subsidiaries. Parker also makes all final significant personnel decisions, including hiring and firing employees, setting employee compensation, setting employee policies, and determining employees' job titles for RC-1 and its subsidiaries.

58.     At all relevant times, Parker acted as an "employer" within the meaning of the statutes that form the basis of this action.

59.    Medley is an adult individual and is a citizen and resident of the United States. Upon information and belief, Medley resides in Temecula, California.

60.    At all relevant times, Medley was RC-1's Chief Operating Officer and Medley Comm's President.

61.    Medley controls RC-1's and Medley Comm's operations and finances and jointly makes significant business decisions for RC-1 and Medley Comm. Medley also jointly makes significant personnel decisions, including setting employee compensation and policies for RC-1 and Medley Comm.

62.    At all relevant times, Medley acted as an "employer" within the meaning of the statutes that form the basis of this action.

63.    Ford is an adult individual and is a citizen and resident of the United States. Ford resides in Wayne, Pennsylvania.

64.    At all relevant times, Ford was RC-1's Chief Strategy Officer.

65.    Ford controls RC-1's and its subsidiaries' operations and finances and jointly makes significant business decisions for RC-1 and its subsidiaries. Ford also jointly makes significant personnel decisions, including setting employee compensation, setting employee policies, and determining employees' job titles for RC-1 and its subsidiaries.

66.    At all relevant times, Ford acted as an "employer" within the meaning of the statutes that form the basis of this action.

## Factual Background

### RC-1 Hires Plaintiff; RC-1 and Plaintiff Enter Into an Employment Agreement

67.    RC-1, d/b/a Hi Solutions, provides smart home technology solutions, including home automation, integration, and related services to clients throughout the United States.

68.    On June 12, 2023, RC-1 hired Plaintiff to work as Chief Financial Officer.

69.   Plaintiff accepted RC-1's offer of employment.

70.   On June 12, 2023, RC-1 and Plaintiff executed an Employment Agreement, which Parker executed on RC-1's behalf. A true and correct copy of the Employment Agreement is attached as **Exhibit P-1**.

71.   According to the Employment Agreement:

(a)   Plaintiff's job title was Chief Financial Officer. [Exhibit P-1 at ¶¶ 1-2].

(b)   Plaintiff's primary duties included financial management, oversight, and related responsibilities in support of RC-1's operations.

(c)   Plaintiff was entitled to a base salary of $250,000 per year, payable in installments as the Company customarily pays its other senior level employees and not less than monthly. [Exhibit P-1 at ¶ 3(a)].

(d)   Plaintiff was entitled to a bonus equal to 30% of base salary ($75,000) based on achievement of specific targets. [Exhibit P-1 at ¶ 3(b)].

(e)   Plaintiff was entitled to equity awards in the form of stock options exercisable for 4,000,000 shares of common stock. [Exhibit P-1 at ¶ 3(c)].

(f)   Plaintiff had the right to resign for "Good Reason" if the Company materially breached the Agreement, including by reducing base salary or failing to pay compensation owed. [Exhibit P-1 at ¶¶ 4(a)(ii), 4(c)].

(g)   Upon resignation for Good Reason, Plaintiff was entitled to severance, including continued salary and benefits for six (6) months. [Exhibit P-1 at ¶ 4(c)].

72.   Plaintiff commenced employment with RC-1 on June 12, 2023.

73.   Plaintiff's duties included accounting and finance duties for RC-1 subsidiaries.

74.   Plaintiff performed his duties diligently until his resignation on October 4, 2024.

75.     In addition to the Employment Agreement, on June 11, 2024, Plaintiff entered into a Note Purchase Agreement with RC-1, under which Plaintiff loaned $50,000 to RC-1. A true and correct copy of the Note Purchase Agreement is attached as **Exhibit P-2**, and a true and correct copy of the Unsecured Convertible Promissory Note is attached as **Exhibit P-3**.

76.     The note matured on July 31, 2024, and remains unpaid.

**Defendants Fail to Pay Plaintiff's Compensation**

77.     Between May 24, 2024 and November 4, 2024, Defendants failed to pay Plaintiff's base salary as required by the Employment Agreement, totaling $106,730.76.

78.     Defendants also failed to pay Plaintiff's $75,000 bonus for the 2023 calendar year, despite Plaintiff achieving the required targets.

79.      Defendants failed to pay Plaintiff accrued vacation benefits in the amount of $11,471.15 upon Plaintiff's resignation for Good Reason.

80.     Defendants failed to pay Plaintiff severance, including continued salary ($125,000.00) and benefits for six (6) months following Plaintiff's resignation for Good Reason.

81.     Defendants failed to pay the $50,000 principal plus $10,000 interest due under the Convertible Note upon its maturity on July 31, 2024.

82.     On October 4, 2024, Plaintiff sent a demand letter to Parker notifying Defendants of the material breaches and demanding payment by 5:00 p.m. that day. Plaintiff also advised Parker that if the material breaches were not remedied, he would tender his resignation for "Good Reason" pursuant to Paragraph 4(c) of the Employment Agreement. A true and correct copy of the October 4, 2024 demand letter is attached as **Exhibit P-4**.

83.     Defendants failed to remedy the breaches.

84.    Accordingly, on October 4, 2024, Plaintiff resigned for "Good Reason" pursuant to the Employment Agreement. A true and correct copy of the October 4, 2024 resignation letter is attached as **Exhibit P-5**.

85.    Following his resignation, Plaintiff continued to work for RC-1 until November 4, 2024.

86.    As of November 4, 2024, Defendants owed Plaintiff approximately $253,201.91, consisting of $106,730.76 in unpaid salary, $75,000 bonus for 2023, $11,471.15 vacation pay, and $60,000 under the note.

87.    Following November 4, 2024, Defendants owed Plaintiff severance, including continued salary ($125,000.00) and benefits for six (6) months following Plaintiff's resignation for Good Reason.

88.    On May 22, 2025, Plaintiff's counsel sent a further demand letter to Parker on behalf of Plaintiff, detailing the breaches. A true and correct copy of the May 22, 2025 demand letter is attached as **Exhibit P-6**.

89.    Defendants have continued to refuse payment, causing Plaintiff ongoing harm.

90.    Parker, Ford and Medley, as CEO, CSO and COO respectively, knowingly permitted and directed these failures to pay, making them personally liable under the WPL.

### Count I
### Violation of the New Jersey Wage Payment Law
### Plaintiff v. All Defendants

91.    Paragraphs 1 through 90 are incorporated herein by reference as if set forth at length.

92.    The WPL requires employers to pay wages, including salary, bonuses, and accrued vacation pay, promptly and in full.

93.    Defendants are employers within the meaning of the WPL. *See* N.J.S.A. 34:11-4.1(a).

94.    Defendants violated the WPL by failing to pay Plaintiff's:

    (a)    Salary from May 24, 2024 to November 4, 2024 ($106,730.76);

    (b)    2023 bonus ($75,000);

    (c)    Accrued vacation ($11,471.15); and

    (d)    Severance, including continued salary ($125,000.00) and benefits for six (6) months.

95.    Upon information and belief, Parker, Medley, and Ford made the decision to not pay Plaintiff's wages.

96.    More than thirty (30) days have passed since the wages were due to Plaintiff.

97.    Plaintiff did not authorize Defendants to withhold wages.

98.    Defendants' failure to pay all wages owed to Plaintiff is not an inadvertent error made in good faith and Defendants do not have reasonable grounds for believing that their failure to pay wages to Plaintiff is not a violation of the WPL.

99.    These violations were willful and knowing.

100.    Parker, Medley, and Ford are personally liable as they knowingly permitted the violations.

101.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer harm and damages.

102.    Defendants are liable to Plaintiff for all unpaid wages, liquidated damages of 200% of the amounts owed, interest, attorney's fees, and costs.

**Count II**
**Breach of Contract**
**Plaintiff v. Defendant RC-1**

103.    Paragraphs 1 through 102 are incorporated herein by reference as if set forth at length.

104.    On June 12, 2023, RC-1 entered into an Employment Agreement with Plaintiff, requiring payment of salary, bonus, and other compensation.

105.    On June 11, 2024, RC-1 entered into a Note Purchase Agreement with Plaintiff, requiring repayment of $60,000 upon maturity.

106.    At all relevant times, Plaintiff performed his obligations under both agreements.

107.    RC-1 breached the Employment Agreement by failing to pay salary ($106,730.76), bonus ($75,000), and vacation pay ($11,471.15), and by failing to provide severance ($125,000.00) and benefits for six (6) months upon Good Reason resignation.

108.    RC-1 breached the Note Purchase Agreement by failing to pay $60,000 upon maturity.

109.    As a direct and proximate result of RC-1's unlawful conduct, Plaintiff has suffered and will continue to suffer harm and damages.

110.    Plaintiff seeks damages in the amount of all unpaid amounts, interest, costs of action, and such other legal and equitable relief as the Court deems just and proper.

**Count III**
**Unjust Enrichment**
**Plaintiff v. Defendants Hi Solutions, Home Integrator, Booyah, MDA, Medley Comm, Hi Solutions So Cal, ITEC, Best Connected, and Media Tech**

111.    Paragraphs 1 through 110 are incorporated herein by reference as if set forth at length.

112.    As averred above, at all relevant times, Plaintiff worked for Defendants Home Integrator, Booyah, MDA, Medley Comm, Hi Solutions So Cal, ITEC, Best Connected, and Media Tech in his role as RC-1's Chief Financial Officer.

113.    As averred above, at all relevant times, Plaintiff performed his Chief Financial Officer duties diligently until his resignation on October 4, 2024.

114.    As averred above, the Defendant subsidiaries were required to contribute to RC-1's operating expenses, including Plaintiff's compensation

115.    As averred above, Defendants Home Integrator, Booyah, MDA, Medley Comm, Hi Solutions So Cal, ITEC, Best Connected, and Media Tech failed to pay Plaintiff's:

(a)    Salary from May 24, 2024 to November 4, 2024 ($106,730.76); and

(b)    2023 bonus ($75,000).

116.    Defendants Home Integrator, Booyah, MDA, Medley Comm, Hi Solutions So Cal, ITEC, Best Connected, and Media Tech have been unjustly enriched by not paying Plaintiff's full compensation.

117.    As a result, Plaintiff has suffered damages.

## **RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court to:

(a)    Issue a Declaratory Judgment declaring that Defendants' actions, as set forth in this Complaint, violated Plaintiff's rights under the WPL and common law.

(b)    Enter judgment in favor of Plaintiff, and against Defendants, for all unpaid wages, compensatory damages, liquidated damages, pre-judgment interest, and penalties, as allowable under the WPL and common law.

(c)    Enter judgment in favor of Plaintiff, and against Defendant RC-1, for all unpaid amounts due under the Note Purchase Agreement.

(d)     Award Plaintiff reasonable attorney's fees together with the costs of this action.

(e)     Award such other and further legal and equitable relief as may be necessary and appropriate to redress fully the deprivation of Plaintiff's rights and to prevent their recurrence in the future.

## **JURY DEMAND**

Plaintiff hereby demands a jury to try all claims triable by jury.

Respectfully submitted,

Dated: November 17, 2025

Stephanie J. Mensing
NJ Bar No. 010752002
Mensing Law LLC
1515 Market Street, Suite 1200
Philadelphia, PA 19102
(215) 586-3751; (215) 359-2741 fax
stephanie@mensinglaw.com

Attorney for Plaintiff

19

# Exhibit P-1
## Employment Agreement

**EMPLOYMENT AGREEMENT**

This Employment Agreement is made as of the 12th day of June 2023 (the "Effective Date") between RC-1, a Nevada corporation with a principal address of 301 S. State Street, Suite S103, Newtown, Pennsylvania 18940 (the "Company"), and Robert L. Brown, a New Jersey resident with an address of 1 Faith Drive, Egg Harbor Township, New Jersey. 08234 (the "Executive").

WHEREAS, the Company desires to retain Executive as its Chief Financial Officer and the Executive desires to provide his services to the Company, all pursuant to the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein, the parties hereto, each intending to be legally bound hereby, agree as follows:

1. <u>Employment</u>. The Company hereby agrees to employ Executive as its Chief Financial Officer, and Executive hereby accepts such employment and agrees to perform Executive's duties and responsibilities, in accordance with the terms, conditions and provisions hereinafter set forth. This Agreement shall be effective as of the date set forth above and shall continue until it is terminated in accordance with Section 4 hereof.  Nothing in this Agreement shall be construed as giving Executive any right to be retained in the employ of the Company, and thus subject to discharge at any time by the Company with or without Cause as expressly provided in Section 4 below.  Executive represents to the Company that he is not subject or a party to any employment agreement, non-competition covenant, non-disclosure agreement or any other agreement, covenant, understanding or restriction of any nature which would prohibit Executive from executing this Agreement and performing fully his duties and responsibilities hereunder.

2. <u>Duties and Responsibilities</u>.  Executive shall perform all duties and accept all responsibilities incident to such position as may be reasonably assigned to him by the Company's Chief Executive Officer or any other senior officer appointed by the Company's Board of Directors (the "Board").  Executive agrees to use Executive's reasonable best efforts to carry out Executive's duties and responsibilities herein and, consistent with the other provisions of this Agreement.  Executive's membership on the board of directors of other organizations shall not be deemed in violation or contravention of this Section 2, nor shall any activities that are approved by the Board.  Executive will primarily work from his home office, although periodic travel to the Company's executive and regional offices and group functions may be occasionally required.

3. <u>Compensation</u>.

   a.    <u>Base Salary</u>.  For the services rendered by Executive hereunder, the Company shall pay Executive a base salary ("Base Salary"), at the rate of $250,000 per annum. The Base Salary shall be payable in installments at such times as the Company customarily pays its other senior level employees and not less than monthly.  The Board of Directors shall review the Base Salary for increase on not less than an annual basis.

   b.    <u>Bonus</u>. Executive shall be entitled to a cash bonus equal to 30% of Base Salary based 50% upon achievement of Executive-specific targets and 50% upon achievement of Company-specific targets in each calendar year.

DocuSign Envelope ID: 5B6E475F-7BBF-403B-B209-D1048ED3ECE7

      c.    <u>Incentive</u>. The Executive shall be granted an equity award in the form of a stock option exercisable for 4,000,000 shares of common stock of the Company at an exercise price based the current enterprise value of the Company.  The stock option shall vest over four years and contain such other terms as set forth in the standard stock option agreement approved by the Board.

      d.    <u>Retirement and Welfare Plans</u>. Executive shall be entitled to participate in all employee retirement and welfare benefit plans and programs made available to the Company's senior level employees as a group or to its executives generally, as such retirement and welfare plans may be in effect from time to time and subject to the eligibility requirements of the applicable plan.  Nothing in this Agreement shall prevent the Company from amending or terminating any retirement, welfare or other employee benefit plans or programs from time to time as the Company deems appropriate.

      e.    <u>Reimbursement of Expenses; Vacation</u>.  Executive shall be provided with reimbursement of reasonable expenses related to Executive's employment by the Company on a basis no less favorable than that which may be authorized from time to time for senior level employees as a group and shall be entitled to not less than four weeks vacation and sick leave in accordance with the Company's vacation, holiday and other pay for time not worked policies.

4.  <u>Term and Termination</u>.

    a.    <u>Definitions</u>.

        i.    "<u>Cause</u>" means Executive's (i) substantial and willful misconduct with respect to the Company, (ii) breach of or failure to perform his duties under this Agreement; or (iii) conviction of a felony or other crime involving moral turpitude.  In the case of a termination for Cause, the Company shall give Executive written notice of termination specifying the basis for the Company's determination of Cause; provided, however, that in the case of conduct described in clauses (i) and (ii) above, such conduct shall not constitute Cause for the purposes of this Agreement unless (A) the Board shall have given Executive written notice setting forth with specificity the conduct deemed to constitute Cause, a description of reasonable action that would remedy the objectionable conduct, and a reasonable time (not less than 30 days) within which Executive may take such remedial action, and (B) Executive shall not have taken such specified remedial action within such specified reasonable time.

        ii.    "<u>Good Reason</u>" shall mean the occurrence of any of the following events or conditions, unless Executive has expressly consented in writing thereto or unless the event is remedied by the Company promptly after receipt of notice thereof given by Executive:

        (a)    a reduction in Executive's Base Salary;

        (b)    a demotion or a material reduction of Executive's duties hereunder; or

        (c)    any material breach of this Agreement by the Company.

        iii.    "<u>Internal Revenue Code</u>" means the Internal Revenue Code of 1986, as amended.

    b.    <u>Term</u>.  The term of this Agreement shall commence on the Effective Date and continue for three (3) years. This Agreement shall automatically renew for successive one-year periods unless

written notice is given by either party not less than 60 days prior to the expiration of the initial term or the then-current renewal term.

c.     <u>Without Cause and Good Reason</u>.  The Company may remove Executive at any time without "Cause", and Executive may voluntarily resign for Good Reason, from the position in which Executive is employed hereunder upon not less than 30 days' prior written notice to other party; provided, however, that, in the event that such notice is given, Executive shall be under no obligation to render any additional services to the Company and shall be allowed to seek other employment. Upon any such removal or resignation for Good Reason, if Executive executes and does not revoke a written release upon such removal or resignation, substantially in a form approved by the Company, of any and all claims against the Company and all related parties with respect to all matters arising out of Executive's employment by the Company, or the termination thereof (other than claims for any entitlements under the terms of this Agreement or under any plans or programs of the Company under which Executive has accrued a benefit) (the "Release"), Executive shall be entitled to receive severance payments in an amount equal to six (6) months of Executive's monthly Base Salary at the rate in effect immediately before Executive's termination of employment.  The severance amount will be paid in equal monthly installments over the six-month period following Executive's termination of employment, according to the Company's normal payroll practices.  For a period of six (6) months following the date of Executive's termination of employment without Cause or for Good Reason, Executive shall continue to receive the medical coverage in effect at the date of his termination (or generally comparable coverage) for himself and, where applicable, his spouse and dependents, as the same may be changed from time to time for Executives generally, as if Executive had continued in employment during such period.

d.     <u>Voluntary Termination</u>.  Executive may voluntarily terminate his employment for any reason upon 30 days' prior written notice.  In such event not involving Good Reason, after the effective date of such termination no further payments shall be due under this Agreement.

e.     <u>Cause</u>.  The Company may terminate Executive's employment at any time for Cause upon written notice to Executive, in which event all payments under this Agreement shall cease, except for Base Salary to the extent already accrued.  Executive shall be entitled to any benefits accrued or earned before his termination in accordance with the terms of any applicable benefit plans and programs of the Company.

f.     <u>Notice of Termination</u>.   Any termination of Executive's employment shall be communicated by a written notice of termination to the other party hereto given in accordance with Section 10.  The notice of termination shall (i) indicate the specific termination provision in this Agreement relied upon, (ii) briefly summarize the facts and circumstances deemed to provide a basis for a termination of employment and the applicable provision hereof, and (iii) specify the termination date in accordance with the requirements of this Agreement.

5.     <u>Confidentiality</u>.

a.     <u>Company Information</u>.  Executive agrees at all times during his employment with the Company and thereafter to hold in strictest confidence, and not to use, except in connection with Executive's performance of services to the Company, and not to disclose to any person or entity without written authorization of the Company, any Confidential Information of the Company.  As used herein, "Confidential Information" means any Company proprietary or confidential information,

technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers, markets, software, developments, inventions, processes, technology, designs, drawings, engineering, marketing, distribution and sales methods and systems, sales and profit figures, finances and other business information disclosed to Executive by the Company, either directly or indirectly in writing, orally or by drawings or inspection of documents or other tangible property. However, Confidential Information does not include any of the foregoing items which has become publicly known and made generally available through no wrongful act of Executive.

b.    <u>Third Party Information</u>. Executive recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Executive agrees at all times during the term of this Agreement and thereafter to hold such confidential or proprietary information in strictest confidence, not to use it, except in connection with Executive's performance of services for the Company, and not to disclose it to any person or entity, or to use it except as necessary in performing services for the Company, consistent with the Company's agreement with such third party.

c.    <u>Return of Company Property</u>. Promptly upon Executive's termination of employment with the Company, Executive shall deliver to the Company (and will not keep in Executive's possession or deliver to anyone else) all Confidential Information of the Company developed by Executive as part of or in connection with his services to the Company or otherwise belonging to the Company. Executive shall not remove any the Company property from the Company premises without written authorization from the Company.

6.    <u>Non-Competition and Non-Solicitation</u>. In consideration of Executive's employment and grant of equity as a Member of the Company, the Company's promise to disclose Confidential Information and trade secrets of the Company and the experience Executive will gain throughout his employment with the Company, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Executive hereby agrees that while employed at the Company and for a period of one year after termination of such employment (for any reason whatsoever, whether voluntary or involuntarily), Executive will not:

a.    directly or indirectly solicit, entice or induce any Customer (as defined below) to become a client, customer, OEM, distributor or reseller of any other person, firm or corporation with respect to products and/or services then sold or under development by the Company or to cease doing business with the Company;

b.    directly or indirectly solicit, recruit or hire any executive employee of the Company to work for a third party other than the Company or engage in any activity that would cause any executive to violate any agreement with the Company; or

c.    whether alone or as a partner, officer, director, consultant, agent, Executive or stockholder of any company or other commercial enterprise, directly or indirectly engage in any business or other activity in the United States or Canada which is or may be competitive with or render services to any firm or business organization which competes with the Company. Notwithstanding the foregoing, Executive shall be permitted to own securities of a public company not in excess of five percent of any class of such securities and to own stock, partnership interests or other securities

4

DocuSign Envelope ID: 5B6E475F-7BBF-493B-B299-D1048ED3ECE7

of any entity not in excess of five percent of any class of such securities and such ownership alone shall not be considered to be in competition with the Company. For purposes of this Section 6, a Customer means any person or entity which at the time of termination shall be, or shall have been within two years prior to such time, a prospective or existing client, customer, OEM, distributor, licensor, licensee or reseller of the Company.

7. Equitable Relief. Executive agrees that it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth in Sections 5 and 6 of this Agreement. Accordingly, Executive agrees that if Executive breaches such covenant, the Company will have available, in addition to any other right or remedy available, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of any such provision of this Agreement. Executive further agrees that no bond or other security shall be required in obtaining such equitable relief and Executive hereby consents to the issuance of such injunction and to the ordering of specific performance.

8. Non-Exclusivity of Rights. Nothing in this Agreement shall prevent or limit Executive's continuing or future participation in or rights under any benefit, bonus, incentive or other plan or program provided by the Company and for which Executive may qualify; provided, however, that if Executive becomes entitled to and receives the payments provided for in Section 4 of this Agreement, Executive hereby waives Executive's right to receive payments under any severance plan or similar program applicable to all Executives of the Company.

9. Survivorship. The respective rights and obligations of the parties under this Agreement shall survive any termination of Executive's employment to the extent necessary to the intended preservation of such rights and obligations.

10. Notices. All notices and other communications required or permitted under this Agreement or necessary or convenient in connection herewith shall be in writing and shall be deemed to have been given when hand delivered or mailed by registered or certified mail, as follows (provided that notice of change of address shall be deemed given only when received):

If to the Company, to:

> RC-1, Inc.
> 301 S. State Street
> Suite S103
> Newtown, PA 18940
> Attention: Chief Executive Officer

If to Executive, to:

> the address set forth on page one

or to such other names or addresses as the Company or Executive, as the case may be, shall designate by notice to each other person entitled to receive notices in the manner specified in this Section.

11. Contents of Agreement; Amendment and Assignment. This Agreement sets forth the entire understanding between the parties hereto with respect to the subject matter hereof and cannot be

changed, modified, extended or terminated except upon written amendment approved by the Board and executed on its behalf by a duly authorized officer and by Executive. All of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, executors, administrators, legal representatives, successors and assigns of the parties hereto, except that the duties and responsibilities of Executive under this Agreement are of a personal nature and shall not be assignable or delegable in whole or in part by Executive.

12. <u>Interpretation</u>. In this Agreement, (a) unless the context requires otherwise, the singular shall include the plural, the masculine shall include the feminine and neuter, and vice versa; (b) the terms "include," "includes," or "including" shall be deemed to be followed by "without limitation"; (c) unless otherwise specified, references to a Sections shall refer to a Section of this Agreement; (d) reference to a given agreement or instrument shall be a reference to that agreement or instrument as modified, amended, supplemented, and restated through the date as of which such reference is made; and (e) all accounting terms used and not otherwise defined in this Agreement shall have the meanings ascribed to them under U.S. generally acceptable accounting principles.

13. <u>Severability</u>. If any provision of this Agreement or application thereof to anyone or under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provision or application of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision or application in any other jurisdiction. If any provision is held void, invalid or unenforceable with respect to particular circumstances, it shall nevertheless remain in full force and effect in all other circumstances.

14. <u>Remedies Cumulative; No Waiver</u>. No remedy conferred upon a party by this Agreement is intended to be exclusive of any other remedy, and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under this Agreement or now or hereafter existing at law or in equity. No delay or omission by a party in exercising any right, remedy or power under this Agreement or existing at law or in equity shall be construed as a waiver thereof, and any such right, remedy or power may be exercised by such party from time to time and as often as may be deemed expedient or necessary by such party in its sole discretion.

15. <u>Beneficiaries/References</u>. Executive shall be entitled, to the extent permitted under any applicable law, to select and change a beneficiary or beneficiaries to receive any compensation or benefit payable under this Agreement following Executive's death by giving the Company written notice thereof. In the event of Executive's death or a judicial determination of Executive's incompetence, reference in this Agreement to Executive shall be deemed, where appropriate, to refer to Executive's beneficiary, estate or other legal representative.

16. <u>Miscellaneous</u>. All section headings used in this Agreement are for convenience only. This Agreement may be executed in counterparts, each of which is an original. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

DocuSign Envelope ID: 5B6E475F-7BBF-493B-B209-D1048ED3ECE7

17. <u>Governing Law</u>. This Agreement shall be construed and interpreted in accordance with the internal laws of the State of New Jersey without regard to any choice of law or conflict of law, choice of forum or provision, rule or principle (whether of the State of New Jersey or any other jurisdiction) that might otherwise refer construction or interpretation of this Agreement to the substantive law of another jurisdiction. The Parties hereby irrevocably (a) submit themselves to the exclusive jurisdiction of the applicable state courts (and federal courts sitting in the State of New Jersey and (b) waive the right and hereby agree not to assert by way of motion, as a defense or otherwise in any action, suit or other legal proceeding brought in any such court, any claim that it, he or she is not subject to the jurisdiction of such court, that such action, suit or proceeding is brought in an inconvenient forum or that the venue of such action, suit or proceeding is improper. EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Agreement as of the date first above written.

**RC-1, Inc.**

By: _John E. Parker_
D88B82ABBCB34B9...

Name: John E. Parker
Title: CEO

**EMPLOYEE**

By: _Robert Brown_
A6F9DA60DF4F46A...

Name:  Robert Brown

# Exhibit P-2
## Note Purchase Agreement

# NOTE PURCHASE AGREEMENT

**THIS NOTE PURCHASE AGREEMENT** ("Agreement") is made as of June 11, 2024, by and among **RC-1, INC.**, a Nevada limited liability company (the "**Company**"), and each person or entity listed on Schedule A hereto, as such schedule may be updated from time to time (collectively, the "Purchasers"; and individually, a "Purchaser").  Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to them in Section 1 below.

## BACKGROUND

**WHEREAS**, the Company has authorized the sale and issuance of up to an aggregate of $750,000 (or such other amount as the Company shall determine, in its sole discretion) in principal amount of its Unsecured Convertible Promissory Notes, each substantially in the form of Exhibit A hereto (the "Notes"); and

**WHEREAS**, on the date set forth on Schedule A, each Purchaser is purchasing a Note in the aggregate principal amount set forth on the Counterpart Signature Page executed by such Purchaser, which principal amount shall be set forth opposite such Purchaser's name on Schedule A hereto; and

**WHEREAS**, the Company desires to issue and sell the Notes to each Purchaser, and each Purchaser desires to purchase the Notes from the Company, as set forth herein.

## NOW, THEREFORE, THE PARTIES HEREBY AGREE AS FOLLOWS:

1.　　Definitions.

1.1.　　"Common Stock" shall mean the Common Stock, par value $0.001, per share of the Company.

1.2.　　"Conversion Shares" shall mean the Common Stock issued in connection with a conversion pursuant to Sections 3 hereof.

1.3.　　"Conversion Price" shall mean $0.53 per share of Common Stock.

1.4.　　"Effective Time" means the time that the SEC declares the Registration Statement effective.

1.5.　　"Fully-Diluted Capitalization" means, at any relevant time, the then outstanding Common Stock of the Company plus (without duplication) all shares of Common Stock of the Company issuable (at the time or upon passage of time or the occurrence of future

events) upon the exercise, conversion or exchange of all then outstanding vested rights, warrants, options, convertible securities, or other rights or securities convertible into, directly or indirectly, Common Stock of the Company.

1.6.    "Majority Purchasers" means those Purchasers holding, in the aggregate, a majority of the aggregate principal amount of all Notes issued pursuant to this Agreement and outstanding from time to time.

1.7.    "Maturity Date" shall mean July 31, 2024, provided, however, that the Maturity Date shall be accelerated upon the occurrence of an Event of Default set forth in Section 7 of this Agreement.

1.8.    "Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

1.9.    "Securities Act" means the Securities Act of 1933, as amended.

2.    Purchase and Sale of Notes.

2.1.    Purchase and Sale of Notes.  Subject to the terms and conditions of this Agreement, each Purchaser agrees, severally and not jointly, to lend to the Company the aggregate principal amount set forth opposite such Purchaser's name on Schedule A hereto, with such loan to be evidenced by a Note issued to such Purchaser in such amount at the Closing (as defined below).

2.2.    Closing.  The initial purchase and sale of the Notes shall take place at the offices of the Company, at 10:00 a.m. (local time), on the date hereof, or at such other time and place as the Company and each Purchaser agree upon orally or in writing (which time and place are designated as a "Closing").  At the Closing, the Company shall deliver to each Purchaser an executed Note against such Purchaser's loan to the Company in the same amount, payable by check or wire transfer.

2.3.    Additional Purchasers.  At any time following the date hereof, the Company, in its sole discretion, shall be permitted to issue and sell additional Notes pursuant to this Agreement to one or more additional Purchasers at one or more additional Closings.  In connection with any such sale and issuance of additional Notes, any such additional Purchaser shall execute a Counterpart Signature Page to this Agreement and shall thereafter be deemed a "Purchaser" hereunder for all purposes, and Schedule A hereto shall be deemed automatically updated to reflect such purchase.

3.    Conversion.  The outstanding principal balance and accrued interest under the Note (the "Total Amount") may be converted into shares of Common Stock at any time upon the election of the Purchaser, which such number of shares of Common Stock obtained by dividing (A) the Total Amount to be converted on the date of conversion by (B) the Conversion Price.

4    General.  Upon the conversion of the Notes into Common Stock, in lieu of any fractional shares to which the holder of any Note would otherwise be entitled, the Company

shall pay the Note holder cash equal to such fraction multiplied by the Conversion Price. The Company shall not be required to issue or deliver the shares of Common Stock under this Agreement until the Note holder has surrendered the Note to the Company.

4.    <u>Representations and Warranties of the Company</u>.  In connection with the transactions provided for herein, the Company hereby represents and warrants to each Purchaser that:

4.1.    <u>Organization, Standing and Power</u>.  The Company is duly organized, validly existing and in good standing under the laws of the State of Nevada and has full corporate power and authority and possesses all permits necessary to enable it to own, lease or otherwise hold its properties and assets and to conduct its businesses as presently conducted, The Company is duly qualified to do business in each jurisdiction where the nature of its business or its ownership or leasing of its properties makes such qualification necessary and where the failure to so qualify would reasonably be expected to have a material adverse effect.

4.2.    <u>Issuance of the Common Stock</u>.  The Conversion Shares have been duly authorized by the Board of Directors of the Company, and upon issuance to the Holders, all such shares of Common Stock will be duly authorized, validly issued, fully paid and non-assessable and not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under any provision of Nevada law, the Company Articles of Incorporation, the Company Bylaws or any contract or agreement to which the Company is a party or otherwise bound.

4.3.    <u>Authority; Execution and Delivery; Enforceability</u>.  The execution and delivery by the Company of this Agreement and the consummation by the Company of the transactions contemplated by this Agreement (the "Transactions") have been duly authorized and approved by the Board of Directors of the Company and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement and such transactions.  This Agreement constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with the terms hereof.

4.4.    <u>No Conflicts; Consents</u>.

(a)    The execution and delivery by the Company of this Agreement does not, and the consummation of Transactions and compliance with the terms hereof will not, contravene, conflict with or result in any default under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a material benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person or entity under, or result in the creation of any liens or encumbrance upon any of the properties or assets of the Company under, any provision of (i) the Company's Articles of Incorporation or Bylaws, (ii) any material agreement to which the Company is a party or by which any of its properties or assets is bound or (iii) any material governmental order or law applicable to the Company or its properties or assets.

(b)    <u>Compliance with Applicable Laws</u>.  the Company is in compliance with all applicable Laws except for instances of noncompliance that, individually and in the

aggregate, have not had and would not reasonably be expected to have a the Company Material Adverse Effect.  the Company has not received any written communication during the past two years from a Governmental Authority that alleges that the Company is not in compliance in any material respect with any applicable Law.

   5. <u>Representations and Warranties of such Purchaser</u>.  In connection with the transactions provided for herein, each Purchaser hereby represents and warrants to the Company that:

    5.1. <u>Authorization</u>.  This Agreement constitutes such Purchaser's valid and legally binding obligation, enforceable in accordance with its terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights, and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.  Such Purchaser represents that it has full power and authority to enter into this Agreement.

    5.2. <u>Purchase Entirely for Own Account</u>.  Such Purchaser acknowledges that this Agreement is made with such Purchaser in reliance upon such Purchaser's representation to the Company that the Notes and the Common Stock issuable upon the conversion of the Notes (collectively, the "<u>Securities</u>") will be acquired for investment for such Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same.  By executing this Agreement, such Purchaser further represents that such Purchaser does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person with respect to the Securities.

    5.3. <u>Disclosure of Information</u>.  Such Purchaser acknowledges that it has received all the information it considers necessary or appropriate for deciding whether to acquire the Securities.  Such Purchaser further represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Securities.

    5.4. <u>Investment Experience</u>.  Such Purchaser is an investor in securities of companies in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Securities.  If other than an individual, such Purchaser also represents it has not been organized solely for the purpose of acquiring the Securities.

    5.5. <u>Ability to Bear Economic Risk</u>.  Such Purchaser acknowledges that investment in the Securities involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold the Securities for an indefinite period of time and to suffer a complete loss of its investment.

5.6.     Accredited Investor.  Such Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities and Exchange Commission (the "SEC"), as presently in effect.

5.7.     Restricted Securities.  Such Purchaser understands that the Securities are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Securities Act of 1933, as amended (the "Act"), only in certain limited circumstances.  Such Purchaser represents that it is familiar with SEC Rule 144, as presently in effect, and understands the resale limitations imposed thereby and by the Act.

5.8.     Further Limitations on Disposition.  Without in any way limiting the representations set forth above, such Purchaser further agrees not to make any disposition of all or any portion of the Securities unless and until:

(a)     There is then in effect a Registration Statement under the Act covering such proposed disposition and such disposition is made in accordance with such Registration Statement; or

(b)     Such Purchaser shall have notified the Company of the proposed disposition and shall have furnished the Company with a detailed statement of the circumstances surrounding the proposed disposition, and if reasonably requested by the Company, such Purchaser shall have furnished the Company with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration under the Act or any applicable state securities laws, provided that no such opinion shall be required for dispositions in compliance with Rule 144, except in unusual circumstances.

(c)     Notwithstanding the provisions of paragraphs (a) and (b) above, no such registration statement or opinion of counsel shall be necessary for a transfer by such Purchaser to a partner (or retired partner) or member (or retired member) of such Purchaser in accordance with partnership or limited liability company interests, or transfers by gift, will or intestate succession to any spouse or lineal descendants or ancestors, if all transferees agree in writing to be subject to the terms hereof to the same extent as if they were Purchasers hereunder.

5.9.     Taxes.  Such Purchaser represents that such Purchaser has had an opportunity to ask questions and receive answers from the Company regarding the Company, its business and the terms and conditions of the offering of the Securities.  The foregoing, however, does not limit or modify the representations and warranties of the Company in Section 5 of this Agreement or the right of the Purchaser to rely thereon.  With respect to tax considerations involved in the investment, the Purchaser is not relying on the Company.

5.10.     Legends.  It is understood that the Securities may bear the following legend:

"THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT."

6.      Defaults and Remedies.

        6.1.    Events of Default. Each of the following events shall be considered an "Event of Default" with respect to the Notes:

                (a)    The Company shall default in the payment of any part of the principal or unpaid accrued interest on the Notes when due;

                (b)    The Company shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts as they become due, or shall file a voluntary petition for bankruptcy, or shall file any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, dissolution or similar relief under any present or future statute, law or regulation, or shall file any answer admitting the material allegations of a petition filed against the Company in any such proceeding, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Company, or of all or any substantial part of the properties of the Company, or the Company or its respective officers, directors or majority members shall take any action looking to the dissolution or liquidation of the Company; or

                (c)    Within thirty (30) days after the commencement of any proceeding against the Company seeking any bankruptcy reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such proceeding shall not have been dismissed, or within thirty (30) days after the appointment without the consent or acquiescence of the Company of any trustee, receiver or liquidator of the Company or of all or any substantial part of the properties of the Company, such appointment shall not have been vacated.

        6.2.    Remedies. Upon the occurrence of an Event of Default under Section 7.1 hereof, at the option and upon the declaration of the Majority Purchasers, the entire unpaid principal and accrued and unpaid interest on the Notes shall, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived, be forthwith due and payable, and such holder may, immediately and without expiration of any period of grace, enforce payment of all amounts due and owing under such Notes and exercise any and all other remedies granted to it at law, in equity or otherwise.

7.      Miscellaneous.

        7.1.    Successors and Assigns. Subject to the terms and conditions hereof, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the

respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

       7.2.   <u>Confidentiality</u>.  Each Purchaser expressly covenants and agrees that neither such Purchaser nor any of its affiliates (to the extent any such affiliate has received Confidential Information (as defined below)) will disclose, divulge, furnish or make accessible to anyone (other than the Company or any of its affiliates or representatives) any Confidential Information, or in any way use any Confidential Information in the conduct of any business; <u>provided</u>, <u>however</u>, that nothing in this Section 7.2 will prohibit the disclosure of any Confidential Information (i) which is required to be disclosed by the Purchaser or any such affiliate in connection with any court action or any proceeding before any governmental or regulatory authority; (ii) in connection with the enforcement of any of the rights of the Purchaser hereunder; or (iii) in connection with the defense by the Purchaser of any claim asserted against it hereunder; <u>provided</u>, <u>however</u>, that in the case of a disclosure contemplated by clause (i), no disclosure shall be made until the Purchaser shall give prior written notice to the Company of the intention to disclose such Confidential Information so that the Company may contest the need for disclosure, and the Purchaser, at the Company's expense, will cooperate (and will cause its affiliates and their respective representatives to cooperate) with the Company in connection with any such proceeding.  As used herein "<u>Confidential Information</u>" shall mean all data and information relating to the Company or any of its subsidiaries or affiliates, without regard to form or medium, which is not generally known to the general public including, without limitation, technical or non-technical data, specifications, compilations, computer programs and software, products, devices, methods, concepts, know-how, techniques, strategies, designs, drawings, processes, financial data, marketing data, financial plans, product plans, service plans, marketing plans, surveys or lists of actual or potential customers or suppliers.  Confidential Information does not include any data or information that has been voluntarily disclosed to the public by the Company or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.

       7.3.   <u>Restriction on Assignability</u>.  No Purchaser may assign or transfer any Notes without the prior written consent of the Company, except to affiliates of such Purchaser.

       7.4.   <u>Governing Law</u>.  This Agreement and the Notes shall be governed by and construed under the laws of the State of Nevada as applied to agreements among Nevada residents, made and to be performed entirely within the State of Nevada.

       7.5.   <u>Counterparts</u>.  This Agreement may be executed by facsimile signature and in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

       7.6.   <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

7.7.    Notices.  All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given:  (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail if sent during normal business hours of the recipient, if not so confirmed, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent to the respective parties at the following addresses (or at such other addresses as shall be specified by notice given in accordance with this Section 8.7):

If to the Company:

RC-1, Inc.
301 S. State Street
Suite S103
Newtown, PA 18940
Attention: CEO

If to any Purchaser:

At the addresses shown on the Counterpart Signature Page executed by such Purchaser.

7.8.    Finder's Fee.  Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction.  Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which such Purchaser or any of its officers, directors, employees or representatives is responsible.  The Company agrees to indemnify and hold harmless such Purchaser from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, directors, employees or representatives is responsible.

7.9.    Expenses.  If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

7.10.    Entire Agreement.  This Agreement and the Notes and the other documents delivered pursuant hereto constitute the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.

7.11.    Amendments and Waivers.  Any term, covenant, agreement or condition of this Agreement or any of the Notes may be amended, and compliance therewith may be waived (either generally or in a particular circumstance and either retroactively or prospectively), by one or more substantially concurrent written instruments signed by the Company and by the

Majority Purchasers.  Any amendment to this Agreement or any of the Notes or waiver effected in accordance with this Section 7.11 shall be binding upon all of the Purchasers and the Company.  Notwithstanding anything herein to the contrary, the Company may increase the amount of the Notes to be issued and sold hereunder, in its sole discretion, without the consent of any Purchaser.

7.12.    Severability.  If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

7.13.    Purchase Agreement.  Each Purchaser understands and agrees that the conversion of the Notes into Conversion Securities may require such Purchaser's execution of certain agreements in the form agreed to by investors in the First Equity Financing relating to the purchase and sale of such securities as well as registration, co-sale, rights of first refusal, rights of first offer and voting rights, if any, relating to such securities.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**RC-1, INC.**


By:_____
        Name:  John E. Parker
        Title: President and Chief Executive Officer

PURCHASER COUNTERPART SIGNATURE PAGE

The undersigned hereby adopts and agrees to be bound as a "Purchaser" under the Note Purchase Agreement, dated as of June 11, 2022, entered into by and among RC-1, Inc., a Nevada corporation (the "Company"), and the other Purchasers party thereto from time to time (the "Note Purchase Agreement"), and further authorizes the Company to attach this signature page to the Note Purchase Agreement in order to make the undersigned "Purchaser" a party to the Note Purchase Agreement, and subject to all of the provisions thereof as a "Purchaser" thereunder.

By:  Robert Brown

Date: June 11, 2024

Name:  Rob Brown
Address:

Principal Amount of Note: $50,000

# Exhibit P-3
## Unsecured Convertible Promissory Note

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.  THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER SUCH ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SUCH ACT.

## UNSECURED CONVERTIBLE PROMISSORY NOTE

No. 2024-1                                                                    Date of Issuance

$50,000                                                                       June 11, 2024

FOR VALUE RECEIVED, **RC-1, INC,** a Nevada corporation (the "Company"), hereby promises to pay to the order of Robert Brown (the "Holder") the principal sum of fifty thousand dollars ($50,000), together with fixed interest thereon equal to ten thousand dollars ($10,000).  The principal balance and interest shall be payable on July 31, 2031. The outstanding principal balance and interest may be voluntarily converted (the "Conversion") into shares of Common Stock, par value $0.001 of the Company (the "Common Stock") pursuant to Section 3 of that certain Note Purchase Agreement, dated July 11, 2024 (the "Purchase Agreement"), among the Company, Holder and certain other purchasers party thereto from time to time (collectively, with the Holder, the "Purchasers").

This Note is one of a series of unsecured convertible promissory notes of like tenor and ranking without priority over one another (collectively, the "Notes") made by the Company in favor of the Purchasers which have been issued by the Company pursuant to the Purchase Agreement.

1.    Payment.  All payments shall be made in lawful money of the United States of America at the Holder's address, or at such other place as the Holder may from time to time designate in writing to the Company.  Payment shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable and any remainder applied to principal.  Prepayment of principal may not be made without the consent of the Purchaser.

2.    Security.  This Note is a general unsecured obligation of the Company.

3.    Conversion of the Note.  This Note is voluntarily convertible into shares of Common Stock in accordance with the terms of Section 3 of the Purchase Agreement.  As promptly as practicable after any conversion of this Note, the Company at its expense shall issue and deliver to the holder of this Note, upon surrender of the Note, a certificate or certificates for the number of full shares of Common Stock issuable upon such conversion.

4.    Successors and Assigns.  This Note applies to, inures to the benefit of, and binds the permitted successors and permitted assigns of the parties hereto.  The Holder and any subsequent holder of this Note receives this Note subject to the foregoing terms and conditions, and agrees to comply with the foregoing terms and conditions for the benefit of the Company and any other Holders.

5.    Officers and Managers Not Liable.  In no event shall any officer or director of the Company be liable for any amounts due and payable pursuant to this Note.

6.    <u>Amendment; Waiver</u>.  Any term, covenant, agreement or condition of this Note may be amended, and compliance therewith may be waived (either generally or in a particular circumstance and either retroactively or prospectively), in the manner specified in the Purchase Agreement.  Any amendment or waiver of this Note in accordance with this Section 6 shall be binding upon each of the Company and any subsequent holder of this Note.

7.    <u>Restriction on Assignability</u>.  The Holder may not assign or transfer this Note without the prior written consent of the Company.

8.    <u>Expenses</u>.  The Company hereby agrees, subject only to any limitation imposed by applicable law, to pay all expenses, including reasonable attorneys' fees and legal expenses, incurred by the holder of this Note in endeavoring to collect any amounts payable hereunder which are not paid when due, whether by declaration or otherwise ("<u>Costs</u>").  The Company agrees that any delay on the part of the holder of this Note in exercising any rights hereunder will not operate as a waiver of such rights.  The holder of this Note shall not by any act, delay, omission or otherwise be deemed to have waived any of its rights or remedies, and no waiver of any kind shall be valid unless in writing and signed by the party or parties waiving such rights or remedies.

9.    <u>Notices</u>.  All notices and other communications provided for herein shall be dated and in writing and shall be deemed to have been duly given if delivered in accordance with the notice provisions set forth in Section 8.7 of the Purchase Agreement.

10.    <u>Governing Law</u>.  This Note shall be governed by and construed under the laws of the State of Nevada as applied to other instruments made by Nevada residents to be performed entirely within the State of Nevada.

**RC-1, INC.**


By:_____
　　　Name: John E. Parker
　　　Title: President and Chief Executive Officer

# Exhibit P-4
## October 4, 2024 demand letter

**Robert L. Brown**
**8 Somerton Square**
**Medford, NJ 08055**

---

October 4, 2024

**<u>VIA Certified Mail</u>**

Mr. John Parker
RC-1, Inc.
301 S. State Street, Suite S103
Newtown, PA 18940

Dear John,

As you aware pursuant to our various prior discussions, RC-1, Inc. (the "Company") has failed to pay my base salary "in installments at such times as the Company customarily pays its other senior level employees and not less than monthly," as required by Paragraph 3(a) of my June 12, 2023Employment Agreement (the "Agreement"). As you are also aware, the Company has failed to pay my cash bonus for the 2023 calendar year, as required by Paragraph 3(b) of the Agreement. The Company currently owes me $91,346.15 in back compensation for the time period May 24, 2024 through October 4, 2024 a $75,000 bonus related to calendar year 2023.

Please accept this letter as written notice that the Company has materially breached the Agreement and as demand for payment of my back compensation and bonus. If this breach is not remedied by 5:00 p.m. on Friday, October 4, 2024, I will be tendering my resignation for "Good Reason" pursuant to Paragraph 4(c) of the Agreement.

In addition, pursuant to my Convertible Note Purchase Agreement that matured on July 31, 2023, the Company owes me an additional $60,000.00. Please accept this letter as my demand for payment pursuant to that agreement as well.

Best regards,

# Exhibit P-5
## October 4, 2024 resignation letter

**Robert L. Brown**
**8 Somerton Square**
**Medford, NJ 08055**

October 4, 2024

**<u>VIA Certified Mail</u>**

Mr. John Parker
RC-1, Inc.
301 S. State Street, Suite S103
Newtown, PA 18940

Dear John,

Please accept this letter as my formal notice of resignation from my position as CFO of RC-1, Inc. effective immediately.

As of today, I am owed $237,085.34 from RC-1, Inc., representing $91,346.15 in back compensation through October 4, 2024, a $75,000.00 bonus related to 2023, $10,739.18 in earned vacation benefits and $60,000.00 that matured on July 31, 2024 under my Convertible Note Purchase Agreement. Please advise when I can expect these funds. Given the recent cash flow issues the company has been experiencing, I'm willing to defer receipt of payment to no later than October 18, 2024.

Thank you for the opportunity to work with Hi Solutions.

Best regards,

# Exhibit P-6
## May 22, 2025 demand letter

# Mensing Law LLC

**Philadelphia:**
1515 Market Street, Suite 1200
Philadelphia, PA 19102

**Malvern:**
101 Lindenwood Drive, Suite 225
Malvern, PA 19355

215.586.3751 office / 215.359.2741 fax

Stephanie J. Mensing
stephanie@mensinglaw.com

May 22, 2025

**CONFIDENTIAL;**
**FOR SETTLEMENT PURPOSES ONLY[1]**

**Via Email JP@hi.solutions**

John E. Parker, President and Chief Executive Officer
RC-1, Inc. d/b/a Hi Solutions
301 S. State Street, Suite S103
Newtown, PA 18940

**Re: Unpaid Compensation and Defaulted Note – Robert L. Brown**

Dear Mr. Parker:

Please be advised that I represent Robert L. Brown in connection with his claims against RC-1, Inc. and subsidiaries d/b/a Hi Solutions ("the Company"), and potentially against you personally, as well as against other officers, directors, and executives of RC-1 and its subsidiary companies, for unpaid wages, bonus, benefits, and defaulted note obligations. This letter serves as a formal demand for payment of all sums due and owing to Mr. Brown and provides notice of the legal claims and significant liability the Company and its officers face if this matter is not promptly resolved.

## FACTUAL BACKGROUND

Mr. Brown served as the Company's Chief Financial Officer from June 12, 2023, until his resignation effective October 4, 2024. His Employment Agreement dated June 12, 2023 (the "Employment Agreement") established his terms of employment, including:

---

[1] This letter is sent for settlement purposes only and may not be used for any other purpose, pursuant to Rule 408 of the Federal Rules of Evidence, Rule 408 of the New Jersey Rules of Evidence, and any similar state or local rules.

John E. Parker, President and Chief Executive Officer
May 22, 2025
Page 2

- A base salary of $250,000 per year, payable in installments "at such times as the Company customarily pays its other senior level employees and not less than monthly" (¶3(a));
- A bonus equal to 30% of base salary ($75,000) based on achievement of specific targets (¶3(b));
- Equity awards in the form of stock options (¶3(c));
- A right to resign for "Good Reason" if the Company materially breached the Agreement, including through "a reduction in Executive's Base Salary" (¶4(a)(ii), (c)); and
- Entitlement to six months' severance pay if Mr. Brown resigned for "Good Reason" (¶4(c)).

Beginning on May 24, 2024, the Company stopped paying Mr. Brown's salary as required by the Employment Agreement. Despite Mr. Brown's continued performance of his duties, the Company failed to pay him for multiple pay periods. On October 4, 2024, Mr. Brown provided written notice to the Company that it had materially breached the Employment Agreement and demanded payment of his back compensation. The Company failed to cure this breach, and Mr. Brown was forced to resign for "Good Reason" in accordance with Paragraph 4(c) of the Employment Agreement.

Additionally, on June 11, 2024, Mr. Brown invested $50,000 in the Company through an Unsecured Convertible Promissory Note (the "Note"). While the Note itself contains language suggesting a 2031 maturity date, the controlling Note Purchase Agreement clearly states that the "Maturity Date" shall mean July 31, 2024. This is further confirmed in the Summary of the Offering document which also specifies July 31, 2024 as the maturity date. Despite the Note's maturity on July 31, 2024, the Company has failed to repay the principal or the $10,000 in interest due.

**AMOUNTS OWED**

Based on our review of the relevant documents and records, the Company currently owes Mr. Brown the following amounts:

- Unpaid Salary (May 24, 2024 – November 4, 2024): $106,730.76
- 2023 Bonus: $75,000.00
- Accrued Vacation: $11,471.15
- Convertible Note (Principal + Interest): $60,000.00
- Severance (6 months): $125,000.00

**TOTAL AMOUNT DUE: $378,201.91**

John E. Parker, President and Chief Executive Officer
May 22, 2025
Page 3

## LEGAL CLAIMS

Mr. Brown has multiple legal claims against the Company and potentially against you and other officers or directors personally, including:

- **Breach of Contract**: The Company has materially breached the Employment Agreement by failing to pay Mr. Brown's salary and bonus. Under New Jersey law, Mr. Brown is entitled to recover the full amount owed plus interest.
- **New Jersey Wage Payment Law Violations**: Mr. Brown's unpaid salary, bonus, vacation pay, and severance pay all constitute "wages" under the New Jersey Wage Payment Law ("NJWPL"), N.J.S.A. 34:11-4.1 *et seq.*, as amended by the New Jersey Wage Theft Act. The NJWPL provides substantial remedies for violations, including:
  - Liquidated damages of up to 200% of the unpaid wages (potentially an additional $636,403.82 based on the total of unpaid salary, bonus, vacation pay, and severance);
  - Reasonable attorneys' fees and costs;
  - Personal liability for any officers, directors, or managers who knowingly permit violations of the law.
  The willful nature of the Company's failure to pay wages—continuing for several months and persisting despite Mr. Brown's explicit demands for payment—constitutes a clear violation of the NJWPL.
- **Securities Law Claims:** The Company's failure to honor its obligations under the Note Purchase Agreement may give rise to claims under applicable securities laws, potentially including fraud, misrepresentation, or violation of disclosure requirements.

## DEMAND FOR PAYMENT

Given the clear contractual breaches and statutory violations outlined above, demand is hereby made for the Company to pay Mr. Brown the full amount of **$378,201.91** by **June 5, 2025**. Payment should be made by wire transfer to Mr. Brown's designated account.

Should the Company fail to remit payment in full within this timeframe, we will have no choice but to pursue all available legal remedies, which will include:

- Filing a lawsuit in the appropriate New Jersey court for breach of contract and violations of the NJWPL;
- Seeking the full amount owed plus liquidated damages of up to 200% of the wages owed ($636,403.82);
- Pursuing claims under applicable securities laws related to the defaulted note;
- Seeking prejudgment interest on all amounts owed;
- Seeking attorney's fees and costs; and

John E. Parker, President and Chief Executive Officer
May 22, 2025
Page 4

- Naming individual officers and directors, including you, as defendants where permitted by law, particularly under the NJWPL's personal liability provisions.

**LITIGATION HOLD NOTICE**

This letter also serves as notice to the Company of its obligation to preserve all evidence that may be relevant to these claims. The Company must immediately take all appropriate steps to preserve, without alteration, all potential evidence including emails, text messages, financial records, payroll records, board minutes, and any other documents related to Mr. Brown's employment, compensation, or the Note. This includes suspending any automatic deletion or document retention policies that might otherwise result in the destruction of relevant evidence.

This letter is sent without prejudice to all of Mr. Brown's rights and remedies, all of which are expressly reserved.

Please direct all future communications regarding this matter to me. We look forward to your prompt attention to this matter and await your response.

Sincerely,

Stephanie J. Mensing